# Robeson *versus* Schuylkill Navigation Company.

1. A party after having given in evidence part of a conversation, an admission, a deed, a contract, a record, a letter, or any other document, cannot suppress the remainder.

2. The fact that a witness has refreshed his recollection by looking at a

[Robeson *v.* Schuylkill Navigation Company.]

paper in which the facts within his knowledge and hearsay are both set down together does not make the hearsay evidence.

3. When a party admits a letter or other document to be genuine by using it as such, he cannot afterwards deny its authenticity when his opponent desires to use it.

4. The declarations of an alleged agent cannot be given in evidence to charge his principal, unless it is first shown that he was an agent, secondly, that the scope of his general authority embraced the subject he was speaking of, and, thirdly, that he referred to some act of his own which he was then or had recently been doing or causing to be done.

5. When payment is voluntarily made by a corporation for lands they wish to occupy or have occupied, as full compensation, it is to be presumed that the parties measured the loss by the same rule that the law would apply to it.

ERROR to the Court of Common Pleas of *Chester County.*

Action on the case.

The facts fully appear in the opinion of the court by

BLACK, J.—The defendants below were authorized by the act which incorporated them to build dams on the Schuylkill River, being responsible for all injuries thereby occasioned to private property. Under this charter they caused the dam at Fairmount to be built by the city of Philadelphia. It injured the property of Peter Robeson, the plaintiff's father, but his claim for damages was compromised, or, rather, it was ascertained and paid, in 1823. He acknowledged satisfaction and gave them a full release. Since then the Navigation Company, still acting by the agency of the corporation, have raised it higher. This is not denied by either party. The dispute is how much it has been raised since 1823 above the height authorized by the agreement or release of that year. The plaintiffs may recover the injuries caused by any elevation which the agreement did not expressly or impliedly permit. There are six specifications of error, but they are resolvable into three questions of law, as follows:—

1. Whether the plaintiff's witnesses after refreshing their memory from a report made by themselves, and testifying to certain facts, could be compelled, on cross-examination, to state everything else which the report contained.

2. Whether the declarations made by the superintendent of the water-works concerning the work done on the dam could be given in evidence against the Navigation Company.

3. Whether the court put the proper construction on the agreement, made in 1823, between Peter Robeson and the defendants. I will consider these questions in their order.

I. A scientific and practical engineer was employed by the parties to make a survey of the dams. He embodied the results of his examination in a report. This report embraced not only what he saw and could testify to on his own personal knowledge, but certain matters that were inserted on the au-

[Robeson *v.* Schuylkill Navigation Company.]

thority of other persons. When the engineer was called as a witness by the plaintiff he used his report to refresh his memory, and after stating from it all the material facts ascertained by himself, the defendant on cross-examination asked him to read the remainder of his report. This being ruled out, he was requested to repeat what other persons told him, or, in the words of the counsel, to give the data referred to in certain paragraphs of the report. This again was held to be inadmissible, and the question was once more raised by asking what was the difference between the height of the dam, as measured by the witness, and the height it stood at in 1839 and 1843, according to the data given by Graff and Erdman.

Nothing in the law is better settled than the rule that a party cannot pick out such portions of the paper as he thinks will suit his purpose, and then object to the remainder. If the defendants were entitled to the whole of the report because a part of it had been produced, the cross-examination was the right way and the right time to bring it out. We cannot sustain the argument of the plaintiff's counsel that the defendants were bound to open their case and call these witnesses as their own, before they could put the interrogatories objected to. You cannot have one part and suppress another part of a conversation, an admission, a deed, contract, record, a letter, or any other document, and if an attempt be made to do so, the opposing counsel may institute a thorough search for everything necessarily connected with the evidence in chief, and proper to explain it. The truth in a garbled and mutilated form is as well calculated to mislead as positive falsehood. To make it round and full is the object of cross-examination.

But was this legal evidence at all? Could such questions be put under any circumstances or at any time? The right of cross-examination is not unlimited. When a witness has told all he knows he is generally done, and he cannot be asked to add a thing which he does not know, but has merely heard of. Here the witness had testified to certain facts within his knowledge, and the struggle was to make him go further and let the jury hear what was told him by Graff and Erdman. The fact that he had refreshed his recollection by looking at a paper in which the facts and the hearsay were both set down together, can make no difference in the legal admissibility of either. It is just the same as if he carried it all in a memory so retentive that it did not need to be refreshed. A land surveyor may look at his field notes when he testifies about a line he has run, but if he has put on those notes the declarations of a bystander, it has never been heard of that such declarations are thereby made good evidence.

Neither was the hearsay part of the report admissible because

[Robeson *v.* Schuylkill Navigation Company.]

it had been all read on a former trial.  When a party admits a letter or other document to be evidence, by using it as such, he cannot afterwards deny the authenticity when his opponent desires to use it.  But here we have a paper which amounts to no more than a written statement by a witness.  The writer can swear to a part of it.  The other part is not to be taken for true unless it also can be sworn to by somebody.  The paper itself was not evidence, but it was read on one trial by consent.  At the last trial the plaintiffs withdrew their consent and fell back on their legal rights.  They demanded that the evidence should be given from the lips of the witness, which was the only way that any part of it could be legally proved.  If the defendants wanted more than was known by the witness actually called, they should have got it from those who could give it on their own knowledge.

II.  It is unnecessary to discuss the several principles upon which an agent's declarations are received in evidence against his principal.  It is enough to say that Mr. Graff's declarations could not be allowed to affect the present defendants in a case like this, unless it was shown, first, that he was their agent.; secondly, that the scope of his general authority embraced the subject he was speaking of, and thirdly, that his words referred to some act of his own, which he was then or had recently been doing or causing to be done.  Mr. Graff was superintendent of the water-works at Fairmount.  The dam was a part of the water-works as well as of the navigation.  The defendants put it under the charge of the city, and the city gave Mr. Graff charge of it.  The evidence does not permit us to have a doubt that it was the superintendent's right and duty to see that the dam was maintained in such condition as the wants of both works might require, and it is clear that the defendants not only approved of any additional height to which he raised it, but they afterward raised it still higher.  Indeed they do not deny their responsibility for all damages occasioned by the dam in its present state beyond what would have been caused by keeping it at the height authorized by the agreement of 1823.  And the only object of the evidence was to show how much higher it is now than it was then; the dam being under Mr. Graff's control with their consent, they are responsible for what he did and for all that he said about it while he was doing it.  Justice against the grossest wrong doers would very often fail to be done.if nothing could be proved but the naked act of an agent, unexplained by his words.  This point arises on the evidence given by two witnesses, wharf-owners in the neighborhood, who testified that a piece of timber was laid across the dam, and a banking made of stone, brought there in scows; that this was done by Mr. Graff's immediate direc-

tion, he being there every day it was going on, and that he told them it was to raise the dam a foot. higher, and said it was necessary to raise it eighteen inches (it was afterward raised six inches higher) to give head to the wheels and deepen the water for navigation.  We do not see nor understand the principle upon which this could be legally excluded.  He had general power, as superintendent of the water-works, to make such improvements.  It was not necessary to show that he had special instructions either from them or city councils to do this particular thing.  Proof of the act itself being admissible it ought to be accompanied by explanations of its purpose and meaning, which the agent gave at the time he did it.

It is argued that the words attributed by one of the witnesses to the superintendent make him guilty of a fraudulent invention, wanton and wilful injury to the owners of the property up the stream, and the defendants are at least not bound for that. It is true that a master is not answerable for the malice or the fraud of his servant; but Mr. Graff was guilty of neither the one nor the other.  Acting under the charter of the Navigation Company, he had a right to raise the dam, and though he raised it gradually, to avoid raising at the same time the wrath of interested parties, still he did it legally.  We see nothing in his conduct but fidelity to his employers carried, perhaps, a little beyond the strict line of his required duty, and this only in feeling, not in act.  We take it for granted no damages were given, because none ought to be given, for any improper motive which might be supposed to have actuated him.  We supposed, too, that the counsel who tried the cause were not afraid that the evidence would have that effect, since they did not pray for instructions to prevent it.  The judge, of his own accord, laid down the rule which confined the estimate to its true purpose and true basis.

III. In 1819 the Navigation Company authorized the city to build the dam at Fairmount as high as the dam previously erected at the Falls above.  In 1820 the city agreed to build it eighteen inches higher.  In 1821 it was finished.  In 1823 Robeson executed a paper in which he receipted his claim for damages on account of the dam, acknowledged that he had received full compensation, and released forever to the defendants all his demand for losses occasioned to his property "from or by reason of the erection of the said dam at the Falls of the Schuylkill, or the erection of the said dam at Fairmount of *its present height*."   The precise height of the dam, when first finished, is not ascertained.  It is not to be presumed, in the absence of proof, that it was eighteen inches higher than the upper dam merely because the city promised to make it so. But the question how high it was at the time of the release

was submitted to the jury. The fact was found by them, and damages allowed for the whole excess, added since that time. The defendant's counsel think that this was not the true standard—that the jury ought to have been instructed to find the height of the dam originally built, and allow damages only for the elevation added to that. They assert as a fact that it was higher in 1821 than it was in 1823, having sunk in the meantime, and their legal proposition is that the release was a license to maintain it for the future, not at the latter, but at the former level.

We think the court's construction was the correct one. It is true that when property is injured by a public work the owner is entitled to recover for all he is likely to suffer by it in the future as well as for all he has already suffered. The damages are assessed upon the assumption that the work will be kept up and permanently maintained. When payment is voluntarily made and accepted as a full compensation, it is to be presumed that the parties measured the loss by the same rule that the law would apply to it. The plaintiffs therefore can recover in this case for no injuries which might reasonably have been counted on when their ancestor released those injuries as well as all past injuries being then satisfied. But they can recover for all new injuries which he was not then bound to anticipate. Was he bound to suppose that the dam would be afterwards raised? Certainly not. There is not the least reason in the world to believe that the defendants themselves had any such thought. For aught that appears, both they and the city were perfectly satisfied with the dam as it then was.

When a public work is so made as to do an individual a great injury, and it is afterwards changed in a way which causes him loss, the damages will then be estimated so as to pay for the greatest injury as temporary, and the smaller as permanent. For instance, suppose a railroad to be laid out through a man's garden, and subsequently removed to his meadow, would anybody give damages as if it had remained, and were intended to remain, in the former place? And what company would insist, under such circumstances, upon their right to go back again into the garden without a new assessment? So if a dam be erected ten feet high, thereby submerging the whole of a man's farm, and is afterwards reduced to five feet, which leaves only a small part of the land under water, would any jury called to assess the damages after the reduction be willing to view the dam as a permanent structure of ten feet in height? If the dam at Fairmount was higher in 1821 than it was in 1823, Robeson had a right to be paid for all the temporary injuries which he suffered by it before it sunk, but if he demanded reparation for injuries to be after-

wards done by an obstruction previously removed, the defendants had a right to tell him that his claim was absurd.

For these reasons we are perfectly satisfied that the release would not have authorized the defendants to raise the dam a hair's breadth higher than it was at that time, even if it had contained no reference to its height. But what shall we say to the words of the release which expressly limit it to the damages occasioned by the erection of the dam at Fairmount of its present height? These words mean something, but we do not know what unless we understand them as reserving a right to sue for any further elevation. All past damages of every kind were manifestly released. We see that intention all over the paper. We must therefore suppose that the present height was mentioned by way of abundant caution to show that the defendants had no authority from the release to build it higher. But this is unimportant, for the construction of the paper would have been just the same if no such words had been there.

Judgment affirmed.